271 N.J. Super. 476 (1994)
638 A.2d 1341
BARTHOLOMEW W. CATALANE AND GRACE CATALANE, PLAINTIFFS-RESPONDENTS,
v.
GILIAN INSTRUMENT CORPORATION, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 10, 1994.
Decided March 9, 1994.
*480 Before Judges SHEBELL, LONG and LANDAU.
Herbert J. Stern argued the cause for appellant (Stern & Greenberg, attorneys; Mr. Stern and David S. Stone, on the brief).
Linda B. Kenney argued the cause for respondent (Ms. Kenney, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
This appeal arises out of an unlawful termination of employment claim, in which the plaintiff-employee, Bartholomew Catalane (plaintiff), and his wife, Grace Catalane, brought an action for *481 damages against Mr. Catalane's employer, Gilian Instrument Corporation (Gilian). The nine count complaint alleged several distinct but related causes of action: count one: defendant wrongfully terminated plaintiff because of his advanced age in violation of the New Jersey Law Against Discrimination (LAD); count two: defendant wrongfully terminated plaintiff in violation of N.J.S.A. 34:19-1 to -8 (Conscientious Employee Protection Act (CEPA) or the "whistleblower" statute) because plaintiff threatened to report illegal activity to a governmental authority; count three: defendant wrongfully terminated plaintiff for reasons that were contrary to public policy; count four: defendant's agents told plaintiff that he would be employed for as long as he did a good job and thereby created an "express contract" which prevented defendant from terminating him; count five: plaintiff's termination was in violation of an "implied contract;" count six: plaintiff's termination was in violation of an implied covenant of good faith and fair dealing; count seven: defendant, through its agents, intentionally inflicted emotional distress on plaintiff; count eight: defendant, through its agents, negligently inflicted emotional distress on plaintiff; and count nine: plaintiff's wife was caused to suffer the loss of service of her husband as a direct result of the tortious actions of defendant.
The jury found in favor of plaintiffs on all of the grounds alleged except the assertion of malice. It awarded the following damages: $310,000 for plaintiff's loss of wages for termination of employment; $14,250 for the cost of replacing health insurance; $73,000 for a reduction in pension benefits; $250,000 for emotional stress, anxiety caused by lack of information, uncertainty, planning difficulty, career, family, and social disruption, and adjustment problems for plaintiff; and $200,000 in damages for plaintiff's wife on her per quod claim. The initial jury award totalled $847,250. After the return of its verdict for compensation damages, the jury further deliberated, and returned a verdict for punitive damages of $50,000, on the violation of the LAD. The awards, inclusive of pre-judgment interest, totalled $1,146,932.04.
*482 On defendant's motion for a new trial, the trial judge entered an order granting a new trial limited to the awards for emotional distress and per quod damages. Defendant's motion directed to the remaining awards was denied. The court denied plaintiff's motion for an additur as to the loss of pension benefits and punitive damages. Partial judgment was entered in the amount of $397,250, plus prejudgment interest of $90,168.41 and $50,000 in punitive damages, for a total of $537,418.41, plus costs.
Defendant moved for leave to appeal the remaining judgment, and plaintiff cross-moved to appeal the order for a new trial. We granted both motions.
Gilian manufactures and sells pumps and related products that are used to perform air sampling for safety products. The company was founded in 1977 by Hill Lalin, who is and always has been the president, chief executive officer, and sole stockholder of the company. Initially, Gilian had only a few employees. Lalin performed the duties of administrator and director of sales and Joan Ohlhoff, the first full-time employee, handled accounting and personnel matters. By 1981, Gilian had a total of six or seven employees, with five full-time workers. Lalin spent one day per week on the road visiting companies to promote the sales of his products. During these years, Gilian's sales had grown to approximately two million dollars annually.
In mid-1982, plaintiff, who was seventy-one years old and working for a rival distributor, initiated a meeting with Lalin, after he became aware of Gilian's products. Plaintiff met with Lalin and Joan Ohlhoff. After viewing the pump, he stated that he could "sell the living hell out of it." On January 5, 1983, plaintiff began working for Gilian as a full-time salesperson. Lalin testified that during plaintiff's first years working for Gilian, he was a "model salesman" and did a "wonderful job." Initially, plaintiff spent most of his time on the road selling Gilian's products and setting up distributorships. Plaintiff performed other services at Gilian. He hired and trained sales persons, two of whom eventually served as national and international sales managers for Gilian. *483 He advised Gilian as to what products to develop, as well as which products to avoid. He helped Gilian become a marketing source for filters. He located international sources of suppliers for Gilian.
Plaintiff testified that during his first six years with Gilian, he had accomplished a great deal for the company. While testifying, he read the following from a memo that he had written to Hill Lalin on January 9, 1989, in which he had requested a raise:
I am with Gilian exactly six years as of January 8th. And in that period I've taken the sales volume from 100,000 at the end of '82 to 13,000,000 at the end of '88. From 100,000 to 13,000,000.
I have built both a national and international sales force through a chain of distributors which is unmatched. The rapport and loyalty of these distributors has been built and strengthened by me on a continuing basis.
The company continued to grow during the years that plaintiff was there. From 1983 to 1989, Gilian grew from four employees to over 100 employees. According to Lalin, in 1988, when plaintiff left the company, the total sales were approximately eight and one-half million dollars. With its growth, Gilian did not want to lose the accessibility of Lalin, the company president. Therefore, in its policy manual, Gilian promoted this accessibility in a section titled "Access to the President." It declared:
I welcome any employee to discuss any problems concerning employment working conditions, or personnel problems with me so I may be of assistance to you ... feel free to seek my help if you have not received immediate satisfaction after having gone to your immediate supervisor.... My concern for our employees at Gilian is paramount since the employees are responsible for the success or failure of the company. I will endeavor to help every employee to the best of my ability to keep the spirit of cooperation that has made Gilian unique.
Plaintiff testified that despite the amount of business he brought in, Lalin asked him several times, "Do you know how much you're costing me?" Plaintiff claimed that he was referring to the pension contributions made in plaintiff's behalf. Plaintiff claimed that such comments about the cost of plaintiff's pension were also made by Lalin to other Gilian employees.
Lalin testified that plaintiff's attitude began to change. He dated this change as beginning one year before plaintiff left the *484 company, or about January 1988. Lalin claimed that he got "more troublesome." Specifically, Lalin stated that "if things didn't go [plaintiff]'s way, he was  got very upset and everybody knew about it."
Both plaintiff and defendant testified to a personnel problem, regarding a sales manager named Cathy Demauex, as the time when the relationship between plaintiff and Gilian started to deteriorate. In October 1988, the senior personnel at Gilian wanted "to let her go." Plaintiff testified that he was called to a meeting with Lalin, Joan Ohlhoff, Honora Browne, and Wilson Rodriquez, the international sales manager, to discuss Cathy Demauex. Plaintiff claimed that Lalin, Ohlhoff, and Browne had already made their minds up to let Demauex go, but he tried to talk them out of it, as he had hand-picked her and highly regarded her sales ability. Plaintiff testified that he was angry and walked out of this meeting along with Wilson Rodriquez.
Demauex was told that December 9, 1988, would be her last day with Gilian. Plaintiff was informed about this by Lalin, who described plaintiff as "very, very, very upset." According to Lalin, because of this action regarding Ms. Demauex, plaintiff and the entire sales department did not attend the company Christmas party which was held the next day. Demauex did, however, stay on beyond the initial date given for her termination.
Plaintiff went on a business trip and when he returned, Ohlhoff and Browne had selected two candidates, a male and a female, for him to interview. Plaintiff hired the female candidate, after Lalin, Ohlhoff, and Browne also agreed. Plaintiff claimed that for the first time in his history with the company, Lalin then asked him to leave the meeting while the new employee's salary was discussed.
Another area of contention involved the company's issuance of job descriptions at about this same time. Defendant asserts that the incidents surrounding the job descriptions were the "peak" of plaintiff's disregard for authority. Plaintiff counters that he only brought the other employees' dissatisfaction with these job descriptions *485 to Lalin's attention per the directions in the policy manual titled "Access to the President."
Lalin claimed that plaintiff "paraded the whole sales department into [his] office" and "threw the job descriptions on [his] desk." Lalin testified that after plaintiff threw the job descriptions, all the sales personnel "demanded to be fired." Lalin also claimed the plaintiff threatened to report Lalin and the company to some federal agency. Lalin stated that plaintiff was "screaming at the top of his lungs," demanding that Lalin fix these problems or he was going to pull the whole sales department out. According to Lalin, everyone in the whole plant knew what was going on because of the yelling and screaming.
Plaintiff claimed that on January 5, 1989, he called the sales staff consisting of Cathy Demauex, Wilson Rodriquez, and Brian Howles, into his office in order for them to review the job descriptions as he had been instructed to do. The three employees wrote various things on them because they didn't agree with their job descriptions. Plaintiff also wrote his comments on the job descriptions. Plaintiff claimed that he requested that the sales staff have a meeting with Lalin to go over the problems with the job descriptions.
When the meeting began, plaintiff informed Lalin that the sales department did not agree with the job descriptions. Plaintiff testified that he had brought an article from a trade journal about firing at-will employees because of what had gone on with Cathy Demauex. Plaintiff also claimed that he said, "If we can't get it straightened out, then I'm going to take this to whatever federal source or whoever it can be that will do it." Plaintiff felt that it was "his obligation to take care of the people here if they're not being treated properly." Plaintiff claimed that when he left the meeting, he thought the problems would be solved.
Lalin testified that at the end of the meeting, he wanted an apology from everybody in the sales department. Lalin testified that subsequently he had meetings with the "steering committee" made up of the company's legal counsel, his brother, Charles, who *486 was Gilian's financial advisor, Joan Ohlhoff, Honora Browne, and the company accountant. The committee reached the conclusion that plaintiff should be asked to step down and resign and accept a consulting position.
On the Saturday following the "confrontational" meeting, Lalin called plaintiff at home and asked if he could see plaintiff. The following day, Lalin drove from his home in Wayne to plaintiff's house and they went to a diner in Brielle. Lalin taped this conversation without plaintiff's knowledge. Plaintiff apologized several times about his behavior in the meeting. Plaintiff testified that when he left the diner, Lalin and he shook hands and he thought "everything was on a wonderful basis."
After a business trip, plaintiff returned to the office on January 13, 1989. Lalin asked plaintiff to meet with him in his office. Lalin told plaintiff: "I want you to resign." Plaintiff testified that he told Lalin he would not resign; whereupon, Lalin said, "Well, then if you won't resign, I'm terminating you effective as of today."
Lalin's account of what happened differed. He claimed that he made the decision to ask plaintiff to resign when he recognized a short time after their meetings of January 5th and 8th, that the "sales department's allegiance was to [plaintiff] and since the allegiance was to [plaintiff], there would be no way in which I could ensure that [plaintiff] would not repeat this same thing at another time when we had a disagreement." Lalin testified that he asked plaintiff to step down and take a consulting position. The consulting package offered to plaintiff consisted of a $25,000 annual retainer, an hourly stipend that would cover the actual consulting work, a car, and a fax machine. Lalin testified that plaintiff was asked to come back and discuss the consulting arrangements, which Lalin considered negotiable. When plaintiff did not show up as originally scheduled, Lalin faxed plaintiff a new date for a meeting. Plaintiff did come to this meeting.
According to Lalin, when plaintiff came to this meeting, he just kept repeating three questions: "Tell me why I was fired; Tell me *487 what my pension is; and Tell me what my severance is." Mr. Lalin claimed that plaintiff would not discuss a new position until he was given the reasons for his "termination." Plaintiff then walked out the door and Lalin did not hear from him again until the lawsuit was initiated. Plaintiff claimed he would have worked until he was eighty years old, which would have been another year and one-half. It was his understanding that he would have received his company pension at age eighty.
On plaintiff's behalf, Rodriquez and Demauex testified concerning the meeting of January 5th. They claimed that this meeting was no different than previous meetings between Lalin and the staff. They also stated that even though others at the meeting raised their voices, no one else was fired or disciplined except plaintiff. Rodriquez claimed he did not attend the Christmas party because his mother had just been diagnosed as having cancer and his non-attendance had nothing to do with plaintiff. Apparently, Demauex did not go because the party was held on the same night that her employment was to end.
Henry Reider, an independent distributor for Gilian products, testified on plaintiff's behalf regarding a conversation that he had with Lalin. Reider claimed that he telephoned Lalin when he heard about plaintiff's termination. When Reider asked Lalin what was going on, Lalin replied, "[plaintiff] was 78 years old and it was time for him to step down." Reider described plaintiff's reputation in the business community as "legendary." According to Lalin, Reider's services were terminated on April 24, 1990. However, Reider testified that he was fired by Gilian in June 1990, three days after defendant received a copy of Reider's letter that he had sent to plaintiff's counsel detailing the comments made by Lalin about plaintiff's age.
The depositions of Charles Lalin, Hill Lalin's brother, revealed that he had conversations with Hill in which plaintiff's employment and age were discussed. In the deposition, Charles Lalin repeated the general content of this conversation:

*488 we thought, you know [plaintiff] was getting on in age and that there was a good possibility because of, you know, his age that something could happen to him and that we should consider to have, you know, someone to bring along or, you know, in case something did happen to [plaintiff] unforeseen, who would handle  handle that position and how that would be taken care of. It was a concern because he was a valued employee.
Plaintiff's wife, Grace, testified about how things had changed in their relationship after plaintiff lost his job with Gilian. They depleted their savings, had no pension, and were living only on the money from social security and what they borrowed from their sons. She further testified that there was a great deal of stress and tension at home and they had lost "a lot of the closeness and companionship that we had over the years...." Grace, who was 60 years of age, had been married to plaintiff for thirty-eight years, since she was 21.
At the close of plaintiff's proofs, defendant had made a motion for dismissal of the case. During the hearing on this motion, plaintiff withdrew the claim for intentional infliction of emotional distress. The judge reserved decision on defendant's motion until the end of the trial. Defendant then put forth its defense. After the completion of all the testimony, the judge denied defendant's motion for dismissal of plaintiff's claims. Plaintiff also made a motion for a directed verdict which was also denied.
The jury was given a jury verdict sheet with the following eight interrogatories:
1. Do you find that plaintiff proved by a preponderance of the evidence, that his age was a determinative factor in the decision of defendant to terminate his employment?
2. Do you find by a preponderance of the evidence that plaintiff was discharged in violation of the public policy against discrimination in employment based on age?
3. Do you find by a preponderance of the evidence that plaintiff reasonably believed that a specifically described activity, policy or practice of defendant was in violation of the law, rule or regulation, that he threatened to disclose same to a public body and that his discharge was in retaliation for this threat?
4. Do you find by a preponderance of the evidence that defendant breached its personnel policy manual when it terminated plaintiff's employment?

*489 5. Do you find by a preponderance of the evidence that plaintiff has proven that defendant impliedly promised to employ him for so long as he did a good job, i.e., that the defendant impliedly promised only to terminate plaintiff's employment for a good cause and that his employment was terminated without good cause?
6. Do you find that plaintiff has proved by a preponderance of the evidence, that defendant breached the implied covenant of good faith and fair dealing?
7. If you find there was a breach of implied covenant of good faith and fair dealing, you must also make a specific finding as to whether or not the defendant acted maliciously or oppressively?
8. Do you find by a preponderance of the evidence that Plaintiff, Grace Catalane, lost the companionship and comfort of Plaintiff, Bartholomew Catalane, as a proximate result of defendant's violation of the New Jersey law against discrimination or the public policy against discrimination in employment, based on age?
The jury answered "yes" to all questions, except question seven, concerning malice and oppression, to which it answered "no." The jury returned verdicts for compensatory damages. Thereafter, the jury was again charged and deliberated regarding punitive damages under the LAD. Its $50,000 verdict on punitive damages was rendered in favor of the two plaintiffs.
Defendant argues that all of plaintiff's claims were insufficient as a matter of law. Thus, defendant claims it was error for the trial court to deny its motion for a directed verdict. Defendant further claims that this error requires reversal.
Defendant argues that the trial court should have dismissed plaintiff's age discrimination claim because plaintiff was hired at age seventy-two and, therefore, he was not protected by the LAD. Defendant maintains that the LAD affords protection against age discrimination only to those between the ages of forty and seventy years old. Defendant reads a 1985 amendment to N.J.S.A. 10:5-12 as pointing to a legislative intent to exclude from protection those employees over seventy years old. The relevant part of this section provides:
It shall be unlawful employment practice, or, as the case may be, an unlawful discrimination:
a. For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex or atypical hereditary *490 cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age ... provided further that nothing herein contained shall be construed to bar an employer from refusing to accept for employment or to promote any person over 70 years of age. ...

[N.J.S.A. 10:5-12 (emphasis added).]
Defendant further argues that this legislative intent is also evident in another 1985 amendment in which the legislature permits employers to require mandatory retirement of employees after age seventy. See N.J.S.A. 10:5-2.2.
We find defendant's position on this issue to be untenable. The exception in the statute, brought about by the 1985 amendment, is plain and unambiguous; thus, we need not delve deeper to determine the Legislature's intent. Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 128, 527 A.2d 1368 (1987); State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982). It entitles an employer only to refuse to hire or promote a person over 70 years of age. Termination is not excepted. The overall intent of the LAD is to offer protection against discrimination because of age.
If the Legislature intended protection against termination to stop at age seventy, it would have clearly so provided, as did the Federal enactment before its 1986 amendment when it stated "[t]he prohibitions in this chapter shall be limited to individuals who are at least 40 years of age but less than 70 years of age." See Pub.L. 95-256, § 3(a), amended by Pub.L. 99-592 § 2(c)(1) (codified as amended at 29 U.S.C.A. § 631(a)). The public policy to afford protection to individuals over seventy years of age is evidenced by Congress' 1986 amendment to 29 U.S.C.A. § 631(a), which deleted the "less than seventy years of age" phrase and thereby granted protection to all individuals over forty years of age.[1]
*491 Our Supreme Court has held that "`[t]he clear public policy of this State,' as reflected in the LAD, `is to abolish discrimination in the work place.'" Shaner v. Horizon Bancorp., 116 N.J. 433, 436, 561 A.2d 1130 (1989) (quoting Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied sub nom. University of Medicine and Dentistry of New Jersey v. Fuchilla, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988)). There is nothing in the statute to indicate that once an employer hires an individual over seventy, the employer is free to disregard the LAD and discriminate against that employee. Plaintiff, even though hired after age 70, was a member of a class afforded protection under LAD. Such post-age 70 hiring may, however, be strongly evidential as tending to refute the claim of an age-termination violation.
Because plaintiff is entitled to bring a claim under the LAD, we need not consider at length defendant's argument that no common law action for termination based on age discrimination exists in New Jersey. Defendant cites Shaner v. Horizon Bancorp, 116 N.J. 433, 561 A.2d 1130 (1989) and Erickson v. Marsh & McLennan Co., Inc., 117 N.J. 539, 569 A.2d 793 (1990) for support of this contention. Neither case decides the issue of whether the LAD preempts a common law claim for wrongful discharge.
Shaner and Erickson have been interpreted by the Federal District Court for New Jersey to preclude a common law claim where the LAD provides a remedy:
It follows from a close reading of Shaner and Erickson that the Supreme Court does not intend to allow a supplementary common law cause of action where the NJLAD provides a remedy for the wrong. Because there already exists a statutory remedy for plaintiff, it would be inappropriate for this court to extend New Jersey common law in this case.

*492 [Butler v. Sherman Silverstein & Kohl, P.C., 755 F. Supp. 1259, 1265 (D.N.J. 1990) (citing Shaner, supra, 116 N.J. at 454, 561 A.2d 1130 and Wolk v. Saks Fifth Avenue, Inc., 728 F.2d 221 (3d Cir. 1984)).]
Although we may differ from this reading of Shaner and Erickson, we do agree with its conclusion that supplementary common law causes of action may not go to the jury when a statutory remedy under the LAD exists.
Our Legislature has declared the remedies available under the LAD and would appear to have expressed the view that a common law claim for discrimination is unnecessary as the statute should be read broadly enough to encompass those claims and damages previously available at common law. The statute provides:
The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.

[N.J.S.A. 10:5-3 (emphasis added).]
Based on the legislative intent demonstrated by N.J.S.A. 10:5-3, we conclude that the plaintiff's common law claim that he was terminated because of his age in violation of public policy should not have been submitted to the jury. His right and cause of action were statutory.
Similarly, defendant correctly asserts that plaintiff's public policy claim, alleging that he was dismissed in retaliation for his threats of "whistleblowing," was barred by his assertion of that claim under CEPA, the "whistleblowing" statute. N.J.S.A. 34:19-1 to -8. This "bar" is set forth in the statute itself:

*493 Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

[N.J.S.A. 34:19-8 (emphasis added).]
Plaintiff was precluded by this provision from seeking the same remedies at the common law as he sought under CEPA. See Morris v. Coye, 1989 WL 76496 (D.N.J. 1989) (granting summary judgment dismissing all claims under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980) as barred by N.J.S.A. 35:19-8).
Moreover, plaintiff's claim that he was fired in retaliation for threatening to go to federal authorities and "blow the whistle" on Gilian Instruments should not have been submitted to the jury. The evidence presented does not support this claim.
The "Whistleblower Statute" provides in relevant part:
An employer shall not take any retaliatory action against an employee because the employee does any of the following:
a. Discloses or threatens to disclose to a supervisor or a public body an activity, policy or practice of the employer or another employer, with whom there is a business relationship, that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law....

[N.J.S.A. 34:19-3.]
At trial, plaintiff testified that during the January 5th meeting, he said to Hill Lalin, "If we can't get this straightened out, then I'm going to take this to whatever federal source or whoever it can be that will do it." On cross-examination, plaintiff further testified he felt what the company had done to Cathy Demauex was wrong and his "threats" were in regard to the company's treatment of Demauex. He stated that he knew there were "certain labor laws that say that people have to be treated properly" and he told Lalin he was going "to take it up" with the federal authorities, "if we can't get something back on a norm."
*494 In his memorandum of plaintiff's termination, Lalin stated that plaintiff had thrown a sheet of paper on Lalin's desk titled "At-will Firings" and "threatened to go to the IRS." Another sales person, Bryan Howles, also wrote a synopsis of the events and, like Lalin, he recounted that plaintiff "threatened to go to the IRS...." In her statement of the events, Ms. Demauex wrote that plaintiff, at the meeting with Lalin, "threatened that he would report [Lalin] to the IRS."
The record will not support a finding that plaintiff reasonably believed that Gilian was engaged in illegal activity. There is no evidence that plaintiff suspected or was aware of any illegal acts committed by Gilian. No evidence was presented at trial to provide any basis for plaintiff's alleged "threats." Therefore, it was error for the trial judge to submit this claim to the jury.
Defendant asserts that the trial court correctly dismissed plaintiff's express contract claim, but erred by not dismissing plaintiff's implied contract claim. Plaintiff's implied contract claim was based on two things: 1) that the defendant's policy manual created an implied contract; and 2) defendant's employee evaluation system impliedly promised that plaintiff's employment would only be terminated for good cause.
Our Supreme Court has held that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will." Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 285-86, 491 A.2d 1257, modified, 101 N.J. 10, 499 A.2d 515 (1985). Plaintiff has failed to establish a Woolley claim.
Plaintiff maintains that Gilian's manual set forth policies that encouraged "open communication" and that is why he scheduled the January 5th meeting that is at issue. We are convinced, however, the statement in the manual regarding access to the company president is not the type of declaration that Woolley *495 would regard as creating an implied promise of employment benefits or protection. Woolley contemplates that the policy manual must contain more than the company's general policies or goals. Ibid.; see also Kane v. Milikowsky, 224 N.J. Super. 613, 541 A.2d 233 (App.Div. 1988) (holding that memoranda establishing management committee on labor relations and addressing performance evaluation procedures for employee compensation did not contain any implied promise not to terminate officer's employment without cause).
Gilian's policy manual does not address termination or dismissal procedures. The policy statements relied on by plaintiff do not entitle plaintiff to claim a breach of an implied contract. Evaluations may be established for many reasons such as bonuses, promotion, or corrective action. They provide no protection against termination.
Defendant also asserts that plaintiff's termination was an issue that was "vigorously" disputed, and therefore, it was error for the trial judge, over defendant's objection, to take this issue away from the jury by instructing it that it had to find that plaintiff was involuntarily dismissed. We do not agree.
In regard to the issue of "termination," the trial court charged the jury as follows:
I also charge you that because an offer to enter into a consulting contract is not an offer to form an employment relationship, the plaintiff has proven that he was discharged from his employment. You may not consider the offer of a consulting contract as evidence against his contention that he was terminated. That's not a finding you can make. He was terminated and it's not refuted. And, I find that he was terminated. [Emphasis added.]
The ultimate issue is whether the jury was misled or confused. Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 570-71, 512 A.2d 507 (App.Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986). A reasonable jury could not find that plaintiff was offered another position with Gilian. Plaintiff "was terminated," and offered a consulting position, not employment. There was no factual issue for the jury to decide in this regard. Defendant's *496 offer to negotiate clearly related only to the terms of the consulting position.
Defendant also asserts that there was a factual dispute regarding Lalin's statement to Henry Reider and that the trial court misspoke when it was instructing the jury regarding this issue. Reider testified that Lalin told him that "plaintiff was seventy-eight years old and it was time for him to step down." Defendant notes that questions were raised about this testimony at trial, and that on cross-examination, Reider admitted he had been "terminated" as a distributor for Gilian, thereby making Reider's credibility suspect.
The jury charge that defendant complains of, follows:
If you credit the direct evidence offered in this case, of discrimination and by that I am referring to the alleged statement made by Hill Lalin, that he terminated the plaintiff because he was 78 years old, and it was time for him to retire, if you believe that testimony, then you must find that discrimination existed, in violation of the New Jersey law against discrimination. [Emphasis added.]
This charge does not adequately point out that it was Reider who was the source of that testimony, not Hill Lalin. The reference is grammatically in error and should have said the "statement allegedly made by Hill Lalin to Reider." The jury may have been misled by this instruction. Further, the jury was not only required to find that Lalin made such a statement to Reider, it was also required to credit the statement as giving the reason why plaintiff was, in fact, terminated, rather than merely reflecting an opinion on plaintiff's retirement or a statement intended to keep the discord between the company owner and his sales staff within the company. We find this instruction so critical on an essential element of plaintiff's LAD cause of action as to constitute reversible error.
In order for plaintiff to establish a prima facie case under the LAD, he was required to prove that: 1) he was a member of the protected class; 2) he was performing the job at the level that met the employer's legitimate expectations; 3) he was discharged; and 4) the employer sought another to perform the same work after the complainant had been removed from the *497 position. Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 480-81, 593 A.2d 750 (1991); see also Rosenfield v. Wellington Leisure Products, 827 F.2d 1493 (11th Cir.1987). Once plaintiff established a prima facie case, the defendant could rebut the presumption by showing a legitimate non-discriminatory reason for termination. Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 97-98, 570 A.2d 903 (1990). The plaintiff then had the opportunity to prove by a preponderance of the evidence that defendant's "legitimate" reason for termination was not the true reason but merely a "pretext" for discrimination. Ibid. One method used by plaintiff to demonstrate that defendant's legitimate reason was only a pretext was by proving disparate treatment.
The trial judge explained the four-part test discussed above. In regard to disparate treatment, the court instructed the jury as follows:
Now, what do I mean by similarly situated? I mean, not an employee who, for example, worked on the production lines assembling these devices, I mean persons in positions that in your mind, seem similar. Similar duties and responsibilities, similar level of management, similar titles, all those bear on your common sense decision as to what employees are similarly situated and which employees are not.
There is testimony with regard to the other participants in the meeting of January 5, 1983. You have to decide whether the plaintiff was similarly situated, or because he was their supervisor, that he was not similarly situated. That's a decision for you, but you should look at the treatment of similarly situated employees to the extent there has been evidence adduced on it. [Emphasis added.]
Plaintiff argued at trial that he was similarly situated with his subordinates, Bryan Howles and William Rodriquez, and that defendant's failure to fire them was disparate treatment. Defendant contends that the jury instruction was erroneous because plaintiff was not similarly situated with the others as he was their supervisor.
The question of whether they were similarly situated was properly presented to the jury. The trial court's charge was sufficient to focus the jury's attention on the issue. It was a question of fact for the jury to determine whether plaintiff was *498 similarly situated with the other sales personnel. There was no error in this regard.
Defendant contends that "[p]erhaps the most unjust aspect of the trial was [plaintiff]'s claim that defendant fired him to avoid paying a pension." Apparently, in 1988, pension regulations were amended to prohibit an age limit on participation in pension plans. The evidence disclosed that when the law required Gilian to have plaintiff in its pension plan, it went back and retroactively included him in the plan. Plaintiff's counsel had suggested in her opening that plaintiff's termination was somehow related to his right to be included in the pension plan. The court later recognized that there was insufficient evidence to show that defendant had terminated plaintiff to avoid paying his pension. Defendant alleges that the court's failure to explain this decision to the jury which had already heard this evidence was prejudicial error, particularly in light of the emphasis placed by plaintiff on this alleged motivation for an age-related discharge.
The court's failure to instruct the jury to disregard the testimony and comments regarding the pension had the potential to inflame, mislead and confuse the jury. See Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 570-71, 512 A.2d 507 (App.Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986). Plaintiff's assertion that the evidence would have otherwise been admitted on a credibility assessment, may or may not be the case. However, even if it were permitted for some purpose, the jury would have to be told of its limited value, if any. We believe defendant was prejudiced by the judge's failure to inform the jury of the absence of proof on this issue.
The jury awarded plaintiff $250,000 in compensatory damages for emotional stress, anxiety caused by lack of information, uncertainty, planning difficulty, career, family and social disruption, and adjustment problems. Defendant argues that plaintiff was precluded as a matter of law from recovering on his emotional distress claim.
*499 The testimony established that plaintiff suffered emotional stress and trauma. Our Legislature has found that it is a probable consequence of discrimination that emotional distress might be suffered. N.J.S.A. 10:5-3. The Legislature directed that we liberally construe the LAD and it specifically referred to "emotional distress" as a personal hardship that might give rise to "legal remedies" under the LAD. N.J.S.A. 10:5-3. In sexual harassment claims under the LAD, damages for emotional distress have been allowed. Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 609-610, 626 A.2d 445 (1993); Wilson v. Parisi, 268 N.J. Super. 213, 219, 633 A.2d 113 (App.Div. 1993). There is no less reason to allow such damages in an age discrimination claim. Cf. S.L. Industries v. American Motorists, 128 N.J. 188, 212, 607 A.2d 1266 (1992). We do not, however, find any basis to disturb the grant of a new trial as to the extent of these damages, which "shocked the conscience" of the trial judge. Epstein v. Grand Union Co., 43 N.J. 251, 252-53, 203 A.2d 257 (1964). See R. 4:49-1.
The jury awarded $200,000 to plaintiff's wife for per quod damages. The trial court also granted defendant a new trial on the per quod damage award. Defendant urges that the per quod claim should be dismissed or at a minimum that the trial court's decision to order a new trial should be affirmed.
New Jersey has not answered the question of whether per quod damages are recoverable under the LAD; however, other jurisdictions have held that per quod damages are not recoverable under statutes similar to the LAD. See Quitmeyer v. Southeastern Pennsylvania ("SEPTA") Transp. Authority, 740 F. Supp. 363, 370 (E.D.Pa. 1990) (holding that there is no valid claim for loss of consortium in a action for wrongful discharge under F.E.L.A.); Tauriac v. Polaroid Corp., 716 F. Supp. 672 (D.Mass. 1989) (ruling that in an employment discrimination case, there was no valid claim for loss of consortium under state's civil rights statute); Reed v. Johnson Controls, Inc., 704 F. Supp. 170, 172 (E.D.Wis. 1989) (holding loss of consortium claim is not available under the *500 Age Discrimination in Employment Act). Per quod damages are also not recoverable under the "whistleblower" statute. Flaherty v. Enclave, 255 N.J. Super. 407, 414, 605 A.2d 301 (Law Div. 1992).
Our reading of the LAD satisfies us that the Legislature did not intend to establish a cause of action for any person other than the individual against whom the discrimination was directed. See N.J.S.A. 10:5-3. If per quod claims were to be allowed under the Act, the Legislature would have so noted in light of its careful recitation of the damages it intended to allow. Ibid.
The jury also awarded $50,000 in punitive damages under the LAD. The jury awarded these damages even though it answered that it did not find that defendant acted maliciously or oppressively. Defendant urges that "[a] condition precedent to a punitive damages award is the finding that the defendant is guilty of actual malice." Defendant relies on Herman v. Sunshine Chemical Specialties, Inc., 133 N.J. 329, 337, 627 A.2d 1081 (1993), however, Herman involved a products-liability action, not the LAD.
The LAD refers to recovery of punitive damages as follows:
The legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm.... Such harms have, under common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this state.

[N.J.S.A. 10:5-3 (emphasis added).]
In Johnson v. Ryder Truck Rentals, Inc., 264 N.J. Super. 312, 314-15, 624 A.2d 632 (Law Div. 1993), the judge stated:
No New Jersey court has addressed the precise issue presented in this case, which is whether a violation of the NJLAD constitutes willful and wanton conduct which, in and of itself, supports a claim for punitive damages. However, the federal district court in Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118 (D.N.J. 1990), decided that a plaintiff must show more than violation of the statute to be entitled to punitive damages.
The statute does not appear to substantially alter the common law regarding punitive damages. We, therefore, agree that punitive *501 damages are only to be awarded in exceptional cases even where the LAD has been violated. Weiss, supra, 747 F. Supp. at 1135. In Weiss, Chief Judge Gerry stated:
Like any other case where punitive damages are available, punitive damages should only be awarded under the NJLAD in exceptional cases.... In order for punitive damages to be awarded, the defendant's conduct must have been wantonly reckless or malicious. Under New Jersey law, the exceptional nature of a given case and the wanton or malicious nature of the defendant's conduct are questions for the finder of fact.

[Ibid. (citations omitted) (emphasis added).]
"It is within the discretion of the trier of fact to make an award of punitive damages, if there is a legal foundation in the record for an award." Weiss, supra, 747 F. Supp. at 1136 n. 6 (quoting 22 Am.Jur.2d, Damages, § 739 (1988)).
Here, however, the award of punitive damages must be reversed because the jury instruction was erroneous and inadequate. The judge charged the jury as follows:
Plaintiff seeks punitive damages for the discriminatory action of the defendant. If you find that the actions of defendant were discriminatory, which you have, plaintiff can collect punitive damages by showing only that the employer either knew or showed reckless disregard for the matter of whether conduct was prohibited by statute.
The jury should have been instructed that to warrant an award of punitive damages, the defendant's conduct must have been exceptional in nature, rising to the level of wanton or reckless conduct. Further, such terms must be sufficiently defined so that lay jurors can apply the law to the facts as they find them to be.
We set aside the judgment under review. We remand for a new trial on the issue of whether plaintiff was terminated by reason of age discrimination, and if so, the extent of damages to be awarded for emotional stress and trauma. If the jury finds discrimination, the previous compensatory damage award as it pertains to plaintiff's monetary losses may stand. If discrimination is found, the issue of entitlement to, and the extent of, punitive damages must also be retried under the standards we have enunciated.
Reversed, remanded in part.
NOTES
[1] The Federal preemption issue raised by the amendment of 29 U.S.C.A. § 631(a) and its conflict with the exception in N.J.S.A. 10:5-12 that states that nothing in the LAD should be construed "to bar an employer from refusing to accept for employment or to promote any person over 70 years of age" has not been raised and does not need to be decided in view of our present holding. See Fidelity Federal Sav. & Loan Ass'n. v. de La Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664, 675 (1982) (holding that state law is nullified to the extent that it actually conflicts with federal law).