**Daniel TRIPODI, Ph.D., Plaintiff,**

v.

**JOHNSON & JOHNSON and Therakos, Inc., Defendants.**

**Civ. A. No. 90–1926 (DRD).**

United States District Court, D. New Jersey.

Jan. 26, 1995.

Ronald Shur, Voorhees, NJ, Douglas F. Johnson, Kathryn R. Renahan, Earp, Cohn, Leone & Pendery, Westmont, NJ, for plaintiff.

Myron J. Bromberg (Lauren E. Handler, of counsel, Jonathan M. Korn, on brief), Porzio, Bromberg & Newman, Morristown, NJ, for defendants.

## OPINION

DEBEVOISE, Senior District Judge.

Plaintiff, Dr. Daniel Tripodi, brought this suit for wrongful discharge arising out of his employment at defendant, Therakos, Inc. ("Therakos") from January 1, 1988 to July 24, 1989. In his First Amended Complaint, plaintiff advanced many causes of action, but all except a *"Woolley"* claim were dismissed prior to trial on a summary judgment motion. The *Woolley* claim was tried before a jury which returned a verdict in favor of plaintiff, awarding him damages in the amount of $434,000 [1]. Therakos now moves for judg-

ment notwithstanding the verdict, or, alternatively, a new trial. For the reasons set forth below, the motion for judgment n.o.v. will be granted.

### Background

The evidence established that plaintiff was employed by Therakos' parent, defendant Johnson & Johnson, at its corporate headquarters in the Office of Science and Technology from 1983 until December 1987. On January 1, 1988, plaintiff left Johnson & Johnson and became a full-time employee of Therakos, assuming the position of Vice President of Research and Development. Therakos contends that it hired plaintiff for a term of two years. Plaintiff contends that as events unfolded, Therakos' commitment extended beyond two years.

Therakos had developed a photopheresis device ("UVAR"). UVAR was an instrument used to perform photopheresis, a therapeutic procedure that treats white blood cells extracorporeally. At the time plaintiff joined Therakos, Therakos had submitted an application to the Food and Drug Administration ("FDA") for permission to use its UVAR device known as photoceptor to treat Cutaneous T-Cell Lymphoma ("CTCL"). Therakos received FDA approval of photoceptor in March 1988 and began marketing it.

In January 1988, Therakos was seeking to develop an improved UVAR device, which it called Centrinet. It was also seeking to extend the use of photopheresis to the treatment of Scleroderma. Plaintiff was given major responsibility for this project. After plaintiff's arrival at Therakos, differences developed between him and Therakos' president, John MacLean. MacLean became increasingly dissatisfied with plaintiff's performance. Plaintiff, on the other hand, was highly critical of the manner in which Therakos was conducting efficacy testing of the new Centrinet.

Plaintiff contended that the photoceptor, which had been approved by the FDA, and the Centrinet were sufficiently different in structure and operation that, under FDA regulations, new clinical tests would be re-

1. The jury returned a verdict in favor of co-defendant Johnson & Johnson.

quired to establish Centrinet's efficacy. Such tests would have delayed marketing Centrinet. Plaintiff advised MacLean and others of these views and he also advised MacLean that Therakos had to conduct additional testing to determine why in certain *in vitro* tests the same results had been reached using ultraviolet light only and using ultraviolet light and the drug 8–MOP—a result which, he contended, might cast doubts on submissions which Therakos had already made and planned to make to the FDA.

According to plaintiff, he repeatedly raised with MacLean his concerns about these and other areas in which Therakos had not performed and was not planning to perform research, and his concerns that what Therakos planned to do was in violation of FDA regulations. Plaintiff sought to establish that he was correct in his views and that his July 24, 1989 employment termination was because of his justifiable criticisms of the Centrinet approval plans. This, plaintiff contended, violated an agreement which Therakos had made with its employees in its Credo. The Credo is a widely-disseminated document applicable to Johnson & Johnson and all its affiliated companies, including Therakos. It sets forth these companies' general obligations to (i) doctors, nurses patients, customers, suppliers and distributors, (ii) employees, (iii) the communities in which the companies operate, and (iv) stockholders.

The Credo provisions relating to employees read as follows:

We are responsible to our employees, the men and women who work with us throughout the world. Everyone must be considered as an individual. We must respect their dignity and recognize their merit. They must have a sense of security in their jobs. Compensation must be fair and adequate, and working conditions clean, orderly and safe. Employees must feel free to make suggestions and complaints. There must be equal opportunity for employment, development and advancement for those qualified. We must provide competent management, and their actions must be just and ethical.

In particular, plaintiff relied on the Credo provisions that "[employees] must have a sense of security in their jobs," "[e]mployees must feel free to make suggestions and complaints," and "[management's] actions must be just and ethical."

It was Therakos' position that MacLean and others listened to plaintiff's criticisms of the Centrinet testing procedures and proposed FDA submissions and concluded on the basis of opinions of highly qualified people on its own staff and the expert advice of scientists at Yale University that plaintiff was wrong in his opinions and that Therakos could properly rely on the tests which formed the basis for FDA approval of the photoceptor, supplemented by the additional tests which it had proposed.

Therakos contended that it terminated plaintiff's employment for a number of reasons, none of which had anything to do with the testing procedures and the FDA applications. Therakos contended that its reasons included plaintiff's failure to establish a time chart for completion of the engineering of the Centrinet, his failure to meet the goals for completing the various stages of the Centrinet project, inappropriate comments about Therakos' top management, and his failure to guide the research effort at Yale University.

During the trial, each party presented extensive evidence directed to all the factual issues implicated in the parties' contentions.

I presented plaintiff's *Woolley* claim to the jury. I instructed the jury that it first had to determine whether plaintiff and Therakos had agreed to a two-year term of employment or for an indefinite term, informing the jury that plaintiff would have no claim if his employment were for a fixed two-year period.

If the jury found that plaintiff's employment was for an indefinite term, the principles set forth in *Woolley v. Hoffmann–La Roche, Inc.*, 99 N.J. 284, 491 A.2d 1257 (1985) became applicable, and I charged the jury in accordance with those principles. The jury responded to the interrogatories as follows:

1. Was the employment of the plaintiff by Therakos, Inc. for a two year term or for an indefinite term?

| TWO YEAR TERM | X INDEFINITE TERM |
| --- | --- |

[If your answer to this question is "Two Year Term," you should deliberate no further and should advise the court that you have reached a verdict.]

2. Was plaintiff's employment by Therakos, Inc. terminated for just cause?

YES _____ NO __X__

[If your answer to this question is "YES", you should deliberate no further and advise the court that you have reached a verdict.]

3. Did the Credo create a promise by Therakos, Inc. with respect to termination of plaintiff's employment?

YES __X__ NO _____

[If the answer to this question is "NO", you should deliberate no further and should advise the court that you have reached a verdict.]

4. If your answer to question No. 3 is "YES", did Therakos, Inc. breach its promise to plaintiff?

YES __X__ NO _____

[If the answer to this question is "NO", you should deliberate no further and should advise the court that you have reached a verdict.]

5. Did the Credo create a promise by Johnson & Johnson with respect to termination of plaintiff's employment by Therakos, Inc.?

YES __X__ NO _____

6. If your answer to question No. 5 is "YES", did Johnson & Johnson breach its promise to plaintiff?

YES _____ NO __X__

7. If your answer to question 4 or to questions 4 and 6 is "YES", what is the amount of damages, if any, caused by the breach to plaintiff?

$434,000

Therakos had moved for a directed verdict at the close of plaintiff's case and at the close of its own case, thus preserving its right to move for a judgment n.o.v. in the event of an adverse jury verdict. After the jury rendered its verdict, Therakos filed its motion for a judgment n.o.v. or, in the alternative, for a new trial.

*Discussion*

Therakos advances three grounds for its motion: (i) There is no legally sufficient evidentiary basis for the jury to find that plaintiff's employment was for an indefinite term rather than for a two year term; (ii) as a matter of law the Johnson & Johnson Credo did not create an implied contract; and (iii) plaintiff was terminated for just cause and not in violation of any alleged promise within the Credo.

When ruling on a defendant's motion for judgment notwithstanding the verdict, a Court must determine whether the evidence and all justifiable inferences most favorable to plaintiff afford any rational basis for the verdict. *Lightning Lube, Inc. v. Witco Corp.*, 802 F.Supp. 1180, 1185 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3d Cir.1993). Furthermore, the Court is not free to (1) weigh the evidence, (2) pass on the credibility of witnesses, or (3) substitute its judgment of the facts for that of the jury. *Id.*

Applying those standards, I reject Therakos' first and third grounds for its motion.

It is true that the evidence compels the conclusion that when plaintiff first left Johnson & Johnson and joined Therakos all parties agreed and understood that his employment at Therakos was for a two year term, and that Johnson & Johnson had not agreed to take him back at the end of that period. However, there was evidence from which the jury could have concluded that at some point during plaintiff's employment with Therakos he and Therakos had reached an understanding that two years no longer marked plaintiff's termination date and that he could stay on after December 31, 1989.

As to the reasons for plaintiff's discharge, there was substantial evidence to support Therakos' contentions, but there was also some evidence, though not very strong, on the basis of which the jury could have found that Therakos' reasons were pretextual and that Therakos discharged plaintiff for making valid objections to the Centrinet testing program.

Thus, the jury's finding that plaintiff's employment was for an indefinite term and its finding that plaintiff was not fired for just cause must stand.

However, a review of the trial evidence in the light of New Jersey law governing implied promises of employment benefits compels the conclusion that the Credo cannot support a *Woolley* claim.

*Woolley v. Hoffman–LaRoche, Inc., supra,* is, of course, the starting point for any discussion of modification of the employment at will doctrine by implied promises of employment benefits.

It is the New Jersey rule that when employment is for an indefinite term, employment at will is the prevailing rule. *Bernard v. IMI Systems, Inc.,* 131 N.J. 91, 618 A.2d 338 (1993). *Woolley* established one exception: provisions in a company's employment manual, distributed to and relied on by employees, may contractually bind the company to its terms, even if the employment was for an indefinite term and, thus, would otherwise be at-will. *Woolley,* 99 N.J. at 285–86, 491 A.2d 1257.

The criteria for finding such an implied contract were set forth in *Woolley:* "... when [1] an employer of a substantial number of employees [2] circulates a manual [3] that, when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), [4] the judiciary ... should construe them in accordance with the reasonable expectations of the employees." *Id.* at 297–98, 491 A.2d 1257.

The Credo meets the first of these criteria. It is used by Johnson & Johnson and all its subsidiary and affiliated companies (the "family of companies"), including Therakos. Individually and in the aggregate these companies are employers of a substantial number of employees.

As to the first prong of the second criterion, the Credo was circulated widely. A copy for the Credo is attached to this opinion as Exhibit A. There was testimony that it is distributed to every employee and posted in every office of all Johnson & Johnson companies. Plaintiff's Exhibits 53, 54, and 59, excerpts from Johnson & Johnson's annual reports, contain statements about the Credo such as the following:

> It has always been the policy and practice of the Company to conduct its affairs ethically and in a socially responsible manner. This responsibility is characterized and reflected in the Company's Credo and Policy and Business Conduct which are distributed throughout the Company. *Management maintains a systematic program to ensure compliance with these policies.*

\*    \*    \*    \*    \*    \*

1993 was the 50th anniversary of the Johnson & Johnson Credo, which defines the Company's responsibilities to ... employees....

Plaintiff's Exhibit 59.

In addition, there was testimony describing a Credo Task Force of which plaintiff was a member. The Task Force was comprised of executives from various Johnson & Johnson companies who met and developed methods of implementing various portions of the Credo.

Although the Credo was widely circulated to employees and many other persons and groups, it is not an employee manual. However, if all the other *Woolley* criteria were met, the form of the document would not be controlling. *Shebar v. Sanyo Business Sys. Corp.,* 218 N.J.Super. 111, 526 A.2d 1144, *aff'd,* 111 N.J. 276, 544 A.2d 377 (1988).

It is the third and the fourth *Woolley* criteria which simply cannot be met in the present case, that is, an employment document which, when construed in accordance with the reasonable expectations of the employees, provides that certain benefits are an incident of employment.

"A number of factors bear on whether an employee may reasonably understand that an employment manual is intended to provide enforceable obligations, including the definiteness and comprehensiveness of the termination policy and the context of the manual's preparation and distribution." *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385 at 393, 643 A.2d 546 (1994).

The Credo provisions upon which plaintiff relies are the following:

1. employees "must have a sense of security" in their jobs;

2. "[e]mployees must feel free to make suggestions and complaints;"

3. "[w]e must provide competent management, and their actions must be just and ethical."

These generalized statements stand in stark contrast to the manual provisions which New Jersey courts have found give contractual rights to employees.

In *Woolley*, there was a Personnel Policy Manual, the avowed purpose of which was to state "the company's philosophy with respect to terminations of employees and [provide] uniform guidelines for the administration of their policy." The Manual described the types of lay-offs and the types of terminations; it provided guidelines for discharge due to performance; it specified procedures to be followed in the event of a termination. The Court concluded that such detailed and specific clauses *could* be found to be contractually enforceable.

In *Nicosia v. Wakefern Food Corp.*, 136 N.J. 401, 643 A.2d 554 (1994), the Court considered Wakefern's 160–page Human Resources Policies and Procedures Manual which contained an eleven-page section entitled "Wakefern Disciplinary Procedures." The Manual included a definite, comprehensive termination policy; its termination provision provided a three-step disciplinary procedure; it stated that "all steps must be completed in order to discharge for cause"; grounds for immediate discharge were set forth.

In *Witkowski, supra,* the Court considered an employment manual which contained a section setting forth procedures for warning notices in the event of employee violation of company policies or rules and specifying that certain violations, of which seven examples were given, constituted grounds for immediate dismissal.

In *Schwartz v. Leasemetric, Inc.,* 224 N.J.Super. 21, 539 A.2d 744 (App.Div.1988), the court considered a policy manual which provided for a three-step procedure for disciplinary job performance and minor acts of misconduct and stated that certain acts were grounds for immediate termination.

In *Preston v. Claridge Hotel & Casino,* 231 N.J.Super. 81, 555 A.2d 12 (App.Div.1989), the employer had distributed an Employee Handbook to all employees and issued a detailed Policies and Procedures Manual. The handbook provided a step-by-step procedure for dealing with employee problems and enumerated types of conduct that might result in termination. The manual described a four-step disciplinary scheme.

In each of the above cases, the court held that the fact-finder could find that the company had impliedly agreed with its employees to modifications of the employee at will doctrine.

The Credo, however, does not approach the definitiveness of the documents under review in those cases. Rather, the Credo is similar to employer policy statements which New Jersey courts (or federal courts applying New Jersey law) have held as a matter of law cannot create a contractual obligation and cannot abrogate the employment at will doctrine.

In *Kane v. Milikowsky,* 224 N.J.Super. 613, 541 A.2d 233 (App.Div.1988), the trial court had ruled against plaintiff on his *Woolley* claim, which was based on a memorandum entitled Company Rules. Although the Rules sought to define employee actions which constituted offenses and to give notice to employees of the elements of the offenses and the consequences of violating them, the appellate court held that "[t]he rules provide no basis for an implied promise not to terminate without cause." *Id.* at 616, 541 A.2d 233. Distinguishing *Woolley,* the court noted that "[i]n the present case, plaintiff's memoranda do not purport to cover comprehen-

sively the subject of termination." *Id.* at 616, 541 A.2d 233. *Kane* was cited with approval in *Witkowski,* 136 N.J. at 395, 643 A.2d 546. The Credo is far less definitive than the memoranda under review in Kane. It does not cover the subject of termination comprehensively or otherwise. It does not purport even to define permissible and impermissible employee conduct. *See Radwan v. Beecham Laboratories,* 850 F.2d 147, 151 (3d Cir.1988).

The pertinent portions of the Credo bear marked similarities to the document which the terminated employee relied upon in *Catalane v. Gilian Instrument,* 271 N.J.Super. 476, 638 A.2d 1341 (App.Div.1994). In *Catalane,* the employer's policy manual contained a section titled "Access to the President." It stated:

> I welcome any employee to discuss any problems concerning employment working conditions, or personnel problems with me so I may be of assistance to you ... feel free to seek my help if you have not received immediate satisfaction after having gone to your immediate supervisor.... My concern for our employees at Gilian is paramount since the employees are responsible for the success or failure of the company. I will endeavor to help every employee to the best of my ability to keep the spirit of cooperation that has made Gilian unique.

The plaintiff alleged that he had brought personnel problems to the president's attention which resulted in contentious disagreements with the president. He was terminated and, thereafter, asserted a *Woolley* claim based upon the above-quoted provision in the policy manual. Rejecting plaintiff's claim, the Appellate Division noted:

> Plaintiff maintains that Gilian's manual set forth policies that encouraged "open communication" and that is why he scheduled the January 5th meeting that is at issue. We are convinced, however, the statement in the manual regarding access to the company president is not the type of declaration that *Woolley* would regard as creating an implied promise of employment benefits or protection. *Woolley* contemplates that the policy manual must contain

more than the company's general policies or goals. *Ibid; see also Kane v. Milikowsky,* 224 N.J.Super. 613, 541 A.2d 233 (App.Div.1988) (holding that memoranda establishing management committee on labor relations and addressing performance evaluation procedures for employee compensation did not contain any implied promise not to terminate officer's employment without cause).

> Gilian's policy manual does not address termination or dismissal procedures. The policy statements relied on by plaintiff do not entitle plaintiff to claim a breach of an implied contract. Evaluations may be established for many reasons such as bonuses, promotion, or corrective action. They provide no protection against termination.

271 N.J.Super. at 494–95, 638 A.2d 1341.

The Credo's statements that employees must have a sense of security in their jobs, that employees must feel free to make suggestions and complaints and that Therakos must provide just and ethical management lack the specificity and detail required to justify employee reliance on an implied agreement that the employer has modified the at-will doctrine. The Credo statements can only be regarded as Therakos' and Johnson & Johnson's general policies or goals.

Thus, there is no definite and comprehensive termination policy on which plaintiff could have relied. Moreover, the context of the Credo's preparation and distribution do not advance plaintiff's position. In the cases in which an implied promise was found to have existed, there was widespread dissemination of the pertinent manual to employees. It is true that the Credo was continually brought to the attention of employees. But, unlike the situation in other cases, it was also brought to the attention of Johnson & Johnson's other constituencies—its customers, its suppliers, its stockholders. This serves to emphasize the aspirational rather than the contractual nature of the document. Surely, the Credo was not a contract with doctors, nurses, patients, mothers and all others that Johnson & Johnson's products and services would be of high quality and sold at reasonable prices. Nor, could the Credo be considered a contract with suppliers and distribu-

tors that they must have an opportunity to make a profit. Similarly, the Credo could not be construed as a contract with stockholders that the business must make a sound profit.

Any employee reading the Credo could not help but realize that the commitments it makes to these various constituencies were not contracts but, rather, were goals and aspirations. By the same token, employees could not reasonably expect that the generalized statements concerning employee relations were enforceable obligations.

There was insufficient evidence for the jury to find that the Credo provisions created an enforceable promise not to terminate plaintiff for challenging Therakos' plans for testing Centrinet and applying for FDA approval. Consequently, the verdict must be set aside and judgment n.o.v. entered in favor of Therakos.[2]

---

**2.** Were I to have denied Therakos' motion for judgment n.o.v., I would also have denied its motion for a new trial. If I am in error in my conclusion that the Credo cannot, as a matter of law, provide the basis for a *Woolley* claim, there would be no other reason to set the verdict aside.

EXHIBIT A

# Our Credo

We believe our first responsibility is to the doctors, nurses and patients,
to mothers and all others who use our products and services.
In meeting their needs everything we do must be of high quality.
We must constantly strive to reduce our costs
in order to maintain reasonable prices.
Customers' orders must be serviced promptly and accurately.
Our suppliers and distributors must have an opportunity
to make a fair profit.

We are responsible to our employees,
the men and women who work with us throughout the world.
Everyone must be considered as an individual.
We must respect their dignity and recognize their merit.
They must have a sense of security in their jobs.
Compensation must be fair and adequate,
and working conditions clean, orderly and safe.
Employees must feel free to make suggestions and complaints.
There must be equal opportunity for employment, development
and advancement for those qualified.
We must provide competent management,
and their actions must be just and ethical.

We are responsible to the communities in which we live and work
and to the world community as well.
We must be good citizens — support good works and charities
and bear our fair share of taxes.
We must encourage civic improvements and better health and education.
We must maintain in good order
the property we are privileged to use,
protecting the environment and natural resources.

Our final responsibility is to our stockholders.
Business must make a sound profit.
We must experiment with new ideas.
Research must be carried on, innovative programs developed
and mistakes paid for.
New equipment must be purchased, new facilities provided
and new products launched.
Reserves must be created to provide for adverse times.
When we operate according to these principles,
the stockholders should realize a fair return.