**MAXIMUS, INC., Plaintiff,**

v.

**J. Scott THOMPSON and Randel L. Messner, Defendants.**

**No. 99–1407–WEB.**

United States District Court,
D. Kansas.

Nov. 19, 1999.

 

Gary L. Ayers, Foulston & Siefkin L.L.P., Wichita, KS, for Plaintiff.

Lynn D. Preheim, Stephanie N. Scheck, Morrison & Hecker L.L.P., Wichita, KS, for Defendants.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

This matter is before the court on the plaintiff's motion for a preliminary injunction. (Doc. 3). The court held an evidentiary hearing on the motion on November 8, 1999. Because all of the evidence could not be heard at that time, the parties agreed to conduct depositions for several witnesses on November 9 and 11, 1999, and to submit their deposition testimony for the court's consideration in lieu of live testimony from these witnesses. All pertinent evidence relating to the motion has now been submitted and has been reviewed by the court.

The dispute concerns contracts to provide child support enforcement services to the Kansas Department of Social and Rehabilitation Services in southeast Kansas. Maximus obtained contracts with SRS to provide these services in several judicial districts in southeast Kansas beginning in early 1997 and continuing through the end of 1999. Defendants Thompson and Messman, both former employees of SRS, were hired by Maximus early in 1997 to work in southeast Kansas in connection with these contracts. On September 9, 1999, SRS issued a "Request for Proposal" soliciting bids for new contracts. In late September 1999, the defendants submitted their resignations and informed Maximus they were preparing a competing bid for the contracts.

On October 7, 1999, Maximus filed a verified complaint in the instant action alleging various claims against the defen-

dants, including breach of a confidentiality agreement, unfair competition, misappropriation of Maximus trade secrets, interference with current and future business relationships, breach of fiduciary duties and duties of loyalty, breach of duties as attorneys regarding conflicts of interest, and misappropriation of Maximus corporate opportunities. The complaint seeks temporary and permanent injunctive relief "enjoining Defendants from placing bids and obtaining contracts with the SRS in competition with Plaintiff." Doc. 1 at 7. In view of evidence showing that the defendants have already submitted their bids to SRS, Maximus argues that appropriate injunctive relief would now consist of an order requiring the defendants to withdraw their bids or prohibiting them from going forward with the bid process.

## I. *Summary of Evidence.*

The parties have submitted extensive evidence to the court. The following is a summary of some the salient points shown by the evidence.

Plaintiff Maximus, Inc., is a publicly-held Virginia corporation whose stock is traded on the New York Stock Exchange. It specializes in providing consulting and professional services to government agencies. Maximus is a large corporation, with revenues in 1999 in excess of $232 million.

The Kansas Department of Social and Rehabilitation Services ("SRS") is a state agency charged with implementing and administering the child support enforcement program in Kansas, which is a federally mandated program under Title IV–D of the Social Security Act. Under that Act, states must provide services to ensure that legally responsible persons contribute to the support of their children. Those services include finding absent parents and obtaining, reviewing and enforcing child support orders. Pursuant to a directive from the Governor of Kansas, in 1996 Kansas began to privatize these services, and in July of 1996 the State issued a "Request for Proposals" ("RFP") seeking bids from potential contractors to perform child support services for SRS. Bids were solicited to provide these services in various judicial districts of Kansas.

According to William Strate, a Project Manager for Maximus, in 1996 Maximus bid on fourteen judicial districts and obtained contracts for eight of them, including four in southeast Kansas (Judicial District Nos. 6, 11, 14 and 31).

Defendant J. Scott Thompson is an attorney licensed to practice in Kansas. He worked from 1988 to 1994 as an SRS staff attorney in southeast Kansas. From 1994 to January 1997, he worked for SRS as a staff attorney in Topeka. Maximus hired Mr. Thompson in January 1997, as Deputy Project Director. His duties included overseeing day-to-day operations in Maximus' Topeka, Columbus, and Independence, Kansas, offices. After January of 1988, Thompson's was made Project Manager with responsibility for overseeing the Columbus and Independence offices. Maximus employed a total of four attorneys and nineteen support staff in these offices.

Defendant Randel Messner is also an attorney licensed to practice in Kansas. He practiced with a law firm in Medicine Lodge from 1985 until 1988, when he became an SRS staff attorney for child enforcement in Pittsburg, Kansas. Maximus hired Mr. Messner from SRS in January of 1997, as a Lead Attorney. His duties included supervision of three attorneys in Maximus' Columbus and Independence, Kansas, offices, as well as carrying his own case load. Messner was supervised by defendant Thompson.

Upon commencement of employment, Thompson and Messner were given Maximus employee manuals. They each signed an acknowledgment form stating that there was no specified length of employment and that "either I or Maximus can terminate the relationship at will, with or without cause, at any time." Thompson and Messner also signed a statement of understanding about protection of Maximus proprietary items, which included an acknowledgment of the need to protect

products and ideas under Maximus contracts. Pl.Exhs. 31 & 125. It included an acknowledgment that the employee could be held liable for damages resulting from violating the agreement.

All of the parties agree that various difficulties during the initial contract term led to strained relations between Maximus and SRS. In late 1997, SRS's dissatisfaction led it to place Maximus on a "corrective action plan" outlining the performance areas in which it wanted improvement. William Strate of Maximus testified that he drafted the plan and that it was approved by SRS. He testified that as part of the plan he met on a monthly basis with Thompson and a representative of SRS. Strate said that he relied upon Thompson as a former employee of SRS with friends remaining in the department to keep him informed as to what was going on at SRS. He and Thompson discussed various aspects of Maximus' relationship with SRS and how that relationship could be improved. Strate's testimony indicated that he believed Maximus' performance improved under the corrective action plan.

According to Strate, defendant Thompson had access to Maximus confidential information in the course of his employment, including personnel files, Maximus's expenses, company plans on bonus incentives, and various company reports evaluating Maximus' performance under the SRS contracts.

Defendant Scott Thompson testified that in late 1998, he began to contemplate the possibility of leaving Maximus and competing for the southeast Kansas contracts. He testified he was concerned that Maximus would not be servicing this area of Kansas over the long term due to the poor relationship between Maximus and SRS.

Defendant Messner also testified that in late 1998 he began to contemplate the possibility of competing for the contracts because SRS and Maximus were not getting along and he knew that Glen Truglio of Maximus had informed SRS that as far as he was concerned Maximus had several options, one of which was to terminate the contract. According to Messner, Truglio said he told SRS that Maximus could go places where people wanted them to work, which indicated to Messner that perhaps Maximus was not interested in pursuing work in Kansas anymore. In October of 1998, Messner contacted an insurance agent to find out what workers' compensation rates would be if he were to open a law office and obtain the SRS contracts. Also, while he was in Fort Scott to handle his docket in Bourbon County around this time, Messner stopped to meet with an accountant to ask how much it would cost to obtain accounting services if he started a law firm to do the SRS work. Messner compiled a one-page estimate (Pl.Exh.47) in October of 1998 of the costs of operating such a firm. He was aware of the costs of some items, such as supplies and copier costs, from his position at Maximus. He testified that other costs were estimates from various sources, such as an estimation of fringe benefits based upon information provided by his wife. He testified that he based his estimate of salary expenses upon the salaries Maximus had announced for such positions in 1996.

The defendants testified that in March or April of 1999, the relationship between Maximus and SRS was still poor, and that they again began considering the possibility of competing for the SRS contracts. On April 27, 1999, the Fort Scott insurance agent previously contacted by Messner provided him with quotes for workers' comp and business owners' insurance. In April of 1999, the defendants met with Richard Lloyd of the Columbus State Bank to discuss the possibility of obtaining financing for the venture. They discussed the venture in general terms at that time. Thompson testified that Lloyd was noncommittal, and said to come back and see him if they got the point of wanting to pursue it.

In March or April of 1999, Thompson reviewed some of Maximus' bills, and made some notes from those bills about expenses

such as postage, phone, computer charges, travel, and copiers.

In April of 1999, the defendants signed forms acknowledging receipt of a copy of the Maximus Standards of Business Conduct and Ethics. This booklet was distributed to Maximus employees. It contains numerous company policies, including statements cautioning employees against using or disclosing Maximus proprietary and confidential information, and avoiding the appearance of conflicts of interest and disclosing potential conflicts of interest.

The 1997 contracts between SRS and Maximus had a primary term of three years. Additionally, the parties could agree to two one-year extensions. On July 2, 1999, SRS informed Maximus that SRS would not offer an extension on four of the judicial districts. Def.Exh. 521. SRS did offer to extend the contracts, however, on the four districts in southeast Kansas. On July 23, 1999, Maximus informed SRS that it did not want to extend the current contracts, and that it intended to pursue new contracts through bidding if SRS issued RFP's for these and other districts. Def. Exh. 519. William Strate testified that Maximus had underbid the 1997 contracts and wanted to rebid them at a more profitable price. Thompson testified that he was concerned about what Maximus' decision meant to his continued employment, because he thought it was a real possibility that Maximus would not win the contract again because of its relationship with SRS.

The defendants testified that the Maximus decision not to extend the existing contract brought to the forefront the possibility of bidding on a new contract, and they began to assemble a "bank plan" for the purpose of obtaining financing for their venture. Thompson contacted an employee of Blue Cross and Blue Shield to obtain an estimate of rates for health insurance. He told her to assume 22 potential employees, and gave her employee profiles setting forth the age, sex, smoker/non-smoker,

and family status of 22 potential employees. Although plaintiff suggests that Mr. Thompson obtained this information from Maximus' confidential personnel files on its current employees, Thompson testified that he provided the information based on his knowledge from working with these individuals, and that he simply estimated their ages for purposes of the quote. Maximus had not cited any evidence that the ages provided by Thompson reflect the precise ages of Maximus' employees.

During this time, Scott Thompson had discussions with several employees of SRS that he knew. Some of these individuals suggested the possibility of Thompson submitting a bid on the SRS contracts and encouraged him to do so. Sometime in August 1999, Thompson talked with Randy Barker of SRS and asked for a copy of previous bids that had been submitted to SRS. Under Kansas law, the bids submitted to SRS, including Maximus' 1996 bids, became public records after the contracts were awarded. Thompson testified that he specifically requested a copy of a prior bid by Audie Magana, who operated a law practice that was similar to what the defendants were contemplating. In mid to late August, Barker sent Thompson a copy of the Magana bid and other bids, and also gave him a draft of a Request for Proposal. Thompson testified that he looked briefly at the draft RFP, which appeared to him to be essentially the same as the 1996 RFP, although it had some additional material in it. He did not inform Maximus that he had this draft RFP.[1]

By the end of August, the defendants had compiled a bank plan setting forth in detail projected revenues and expenses for their proposed venture working on the SRS contracts. The venture was to be called TMT Support Services, LLC., and included as partners the two defendants and Kenley Thompson, who is Scott Thompson's brother and who also is an

---

1. According to Barker's deposition testimony, he provided a draft of this RFP to another company that requested it, and he said he would have provided it to anyone who requested information on the RFP at that time.

attorney with experience in the child support field. Some of the information in the business plan, such as routine operating expense information, was extrapolated from the defendants' general knowledge of Maximus' expenses. Much of the collection and case load information in the plan was obtained from SRS. Thompson indicated that the salary information used in the plan constituted estimates based on his general knowledge of what starting salaries had been for staff in the Maximus offices, and his assumptions as to what TMT would have to pay to retain Maximus' current staff. The defendants submitted the plan to Mr. Lloyd at the Columbus State Bank.

The defendants planned to offer Maximus' current staff in southeast Kansas positions with TMT if defendants obtained the SRS contracts. Under the RFP's issued by SRS, it is recommended that the vendor who obtains the contract should give priority in hiring to employing staff from the existing contractor.

On September 9, 1999, SRS issued RFP # 528 seeking bids on the four judicial districts in southeast Kansas. Maximus planned to have a meeting of key employees at corporate headquarters in McLean, Virginia, for the weeks of September 20–24 and September 27–October 1, to draft Maximus' bid on this RFP. Mr. Thompson was one of the individuals selected to go, and William Strate talked to Thompson on September 13th about the trip. According to Strate, Thompson said that he could go.

Thompson testified that he had not decided for sure at this point whether he was going to leave Maximus and participate in a bid. Messner testified that he believed that Thompson, because of his position as the only source of income for his family, was hesitant about the venture, and might at any time decide simply to stay with Maximus.

On September 15th or 16th, Thompson was informed by Mr. Lloyd at the Columbus State Bank that the bank would not provide financing for the defendants' venture without an SBA guarantee. Lloyd explained that obtaining SBA approval would take a significant amount of time. Thompson testified that when he became aware of this fact, he assumed that he would continue to work for Maximus because he believed obtaining financing was essential to competing for the bid. Messner also testified that Thompson conveyed this sentiment to him.

On Sunday September 19, 1999, Thompson called Strate and said that he was concerned about a potential conflict of interest. According to Strate, Thompson said that he had just heard that his brother might submit a bid, and that although he had not talked to his brother, he was concerned about the appearance of a conflict if he were to work on Maximus' bid. After some discussion, Strate told Thompson it was probably best that he not go on the Virginia trip. Strate testified that he discussed certain aspects of Maximus' bid with Thompson by phone during that week and requested copies of Thompson and Messner's resumes for inclusion in Maximus' bid.

Messner was determined to go forward with the venture and contacted Martin Schifferdecker at the Girard National Bank. Messner set up an appointment and informed Thompson of it. On September 22, 1999, both of the defendants went to see Schifferdecker and submitted their business plan and filled out a credit application. Schifferdecker told them on the 22nd that he intended to approve their loan application, provided they met a few conditions such as having their wives sign as guarantors and obtaining life insurance. He told them that if they submitted a bid and got the contract to come back and see him.

Mr. Strate, after speaking with some of his superiors, wanted more information from Thompson, and he and Thompson spoke on the phone on September 24th. Strate asked if Thompson's name would appear on his brother's bid and Thompson said it would. According to Strate, the two then had a discussion in which Strate

apparently tried to talk Thompson out of leaving Maximus.

Thompson testified that he discussed the matter in detail with his wife and on Saturday, September 25th, made up his mind that he would resign and would submit a bid with TMT. On Sunday, September 26th, Thompson called Strate and told him he was resigning. At the end of their conversation, Mr. Strate said that he did not mean it as a threat but that the matter was out of his hands and that his superiors would be reviewing the matter with Maximus' general counsel. Messner spoke with Strate by phone later on September 26, 1999, and told Strate that he too was resigning and was going to submit a competitive bid.

On September 29, 1999, the defendants went to Topeka to examine the various proposals and bid information of vendors on the 1996 RFP's. The defendants used these public records to help compile their bids on the current RFP. The bids they examined included Maximus' 1996 bid.

The defendants submitted Articles of Organization to the State of Kansas on October 4, 1999, to form TMT Support Services, LLC.

The plaintiff's verified complaint was filed in this action on October 7, 1999. The defendants were served with the complaint on or about October 13, 1999, a few days before bids were due on the RFP.

On October 19, 1999, the defendants submitted TMT's bid for contracts in the 11th, 14th, and 31st Judicial Districts. Maximus has also submitted bids for these districts.

On November 3, 1999, the defendants received an invitation to attend a "best and final offer" meeting with SRS in Topeka, which is the next step in the process of selecting a vendor on the contracts. The defendants attended the meeting on November 10, 1999.

William Strate of Maximus testified concerning the harm to Maximus arising from the defendants' allegedly wrongful actions. He identified several items of damage, including the expense of a plane ticket to Virginia, salary paid to the defendants while they were performing tasks for their own benefit, the use of company equipment by the defendants for their benefit, and, if Maximus loses the SRS contracts, the lost profit from those contracts. When asked to identify the irreparable harm from the defendant's actions, Mr. Strate identified several items, including damage to the morale of the Maximus staff, damage to Maximus' relationship with SRS, and a negative effect on Maximus' reputation and ability to market its services.

## II. Standards for Preliminary Injunction.

In order to obtain a preliminary injunction, the moving party must establish that (1) he will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, will not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits. *See Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir.1992). When a party satisfies the first three requirements, the standard for meeting the fourth "probability of success" prerequisite becomes more lenient. *Id.* at 1199.

A preliminary injunction is a drastic and extraordinary remedy, and courts do not grant it as a matter of right. *See Paul's Beauty College v. United States*, 885 F.Supp. 1468, 1471 (D.Kan. 1995). The court must deny injunctive relief if the moving party fails to establish any requisite element, and the moving party must establish that it is entitled to injunctive relief by clear and unequivocal proof. *See Packerware Corp. v. Corning Consumer Prods. Co.*, 895 F.Supp. 1438, 1446 (D.Kan.1995); *Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975).

III. *Discussion.*

■ When the foregoing standards are applied to the evidence presented, it is clear to the court that the motion for preliminary injunction must be denied.

■ 1. *Irreparable Harm.* The plaintiff has not presented clear and unequivocal proof that it will suffer irreparable harm if the injunction is not granted. Almost all of the harm testified to by Mr. Strate is economic in nature and can be adequately remedied without an injunction. For example, the expense of a plane ticket, the lost salary paid to the defendants while they were doing personal work, and the harm from the defendants' alleged unauthorized use of Maximus equipment can easily be remedied by an award of damages. The same is clearly true of Maximus' claim that it may lose the SRS contracts. Assuming that occurs, and that Maximus can prove the defendants' wrongful actions caused such a loss, the resulting injury to Maximus can be adequately remedied by an award of damages for lost profits. "Under normal circumstances, monetary loss may be remedied by an award of compensatory damages, and the risk of such loss is therefore not considered irreparable." *Sac and Fox of Missouri v. LaFaver,* 905 F.Supp. 904, 907 (D.Kan.1995). The value of those contracts and the other items of injury mentioned above can be readily established or estimated from the evidence.[2] *See Tri–State Generation & Transmission v. Shoshone River Power, Inc.,* 874 F.2d 1346, 1362 (10th Cir.1989).

■ Mr. Strate identified several items of what he considered to be irreparable harm. He testified that Maximus's reputation and ability to market its services nationwide will suffer if Maximus loses the SRS contracts. In the court's view, such an opinion is based more on speculation than a candid assessment of the potential harm to Maximus. Speculation or unsub-stantiated fears of what may happen in the future cannot provide the basis for a preliminary injunction. *In re Rare Coin Galleries of America, Inc.,* 862 F.2d 896, 902 (1st Cir.1988). Maximus has child support enforcement contracts throughout the United States. The court cannot accept as well-founded an assertion that the loss of four judicial districts in southeast Kansas will have a significant impact on Maximus's future operations or its ability to market its services. Mr. Strate also testified that Maximus will suffer irreparable harm because its relationship with SRS will suffer and that this could affect other contracts. Aside from the speculative nature of the latter claim, Maximus has failed to present clear proof that any damage to its relationship with SRS is attributable to any wrongful actions by the defendants. There is clear and undisputed evidence in the record showing that Maximus and SRS had a strained relationship before the defendants ever contemplated competing against Maximus, and that the relationship remained poor throughout the term of the contracts. If anything, the evidence suggests that the defendants' efforts at Maximus made Maximus's relationship with SRS somewhat better in the southeast Kansas region than it was elsewhere. Mr. Strate also mentioned that the morale of the Maximus staff had suffered from this episode. But as the defendants point out, any such damage has already occurred and can not be remedied by an injunction. Strate further testified that Maximus will suffer irreparable harm because it has case loads that are not being covered in the defendants' absence. Maximus is unlikely to to prevail on a claim of injury from the mere fact of the defendants' departure, however, given that the defendants' employment was at will and they were free to terminate it at any time. Mr. Strate also testified that the loss of Maximus trade secrets—its business practices,

---

**2.** Maximus argues that the defendants do not have adequate assets to pay a judgment. But the evidence suggests a significant probability that the defendants will obtain the SRS con-tracts if Maximus does not, which would provide the defendants a means of paying a judgment.

marketing strategies, and case load ratios—would constitute irreparable harm. Maximus has failed to present clear and specific proof that any trade secrets will be improperly disclosed if an injunction is not granted, or that the resulting harm from the prospect of disclosure justifies injunctive relief.[3] In sum, the court concludes that Maximus has failed to present clear evidence that it will suffer irreparable harm if an injunction is not granted.

2. *Threatened injury versus damage to the opposing party.* As the foregoing discussion indicates, the court concludes that the potential harm to Maximus is essentially economic in nature and can be adequately remedied by an award of damages. Maximus will be able to weather any harm caused by the defendants' actions without a significant detriment to its overall operations. By contrast, the evidence suggests that the harm to the defendants from granting an injunction would be significant. The defendants are now unemployed. An injunction would essentially prevent them from attempting to earn a livelihood in the field in which they are trained. The court thus concludes that the damage to the defendants from granting a preliminary injunction outweighs the threat of injury to Maximus.

3. *Public Interest.* The court concludes that the issuance of an injunction in this case would be adverse to a significant public interest. Specifically, an injunction by this court would interfere with the ability of the State of Kansas to conduct an open bidding process and to freely select what it considers to be the best qualified candidate to perform its child support obligations.

Maximus argues that the enforcement of valid contracts[4] is in the public interest, and that the public has an interest in restraining unfair competitive practices. The court has considered these factors, but concludes they do not warrant preliminary injunctive relief, particularly in view of the ambiguity in the law concerning the scope of an employee's fiduciary duty as applied to plans to compete with an employer. As the defendants point out, it is generally permissible for an employee "to make arrangements to compete" and even to initiate or purchase a rival business while still an employee. *See* Restatement (Second) of Agency § 393, comment e.

---

3. Maximus has not demonstrated clearly that any of the information gathered by the defendants for use in their bank plan or bids was in fact confidential in nature. In connection with its 1996 bids Maximus had to disclose to SRS a wealth of information concerning its operations, including its forms, procedures, proposed budget, salaries, job descriptions, plan for operations, staff, and case load ratios. All of this information became public record as soon as Maximus was awarded the contracts. The evidence further suggests that Maximus had to continually provide SRS detailed information about its operations throughout the term of the contracts. The simple fact is that because Maximus was working on behalf of a public agency, nearly all of the information that Maximus claims as confidential was in fact subject to public disclosure. *See also* Restatement (Second) of Agency § 396, comment b ("[A]n agent frequently acquires information concerning the methods of his employer in doing business and becomes acquainted with his employer's customers and their desires. Information of this sort is barred from use in competition only to the extent that, considering all the circumstances, it would be unfair for the agent to use it."). Under the circumstances, the court concludes that the likelihood of Maximus proving that the defendants misappropriated confidential information or Maximus trade secrets is questionable is view of the non-confidential nature of the material used by the defendants.

4. Maximus argues that the defendants committed a breach of contract by failing to disclose potential conflicts of interest because the Maximus Standards of Business Conduct and Ethics required such disclosure. Maximus also claims a breach of contract from the defendants' alleged violations of an acknowledgment form concerning use of company property. Maximus has presented no evidence that it provided any consideration to the defendants for their alleged promise to abide by these documents, which were signed by the defendants almost two years after they were first employed, and the court thus concludes Maximus has not shown a likelihood of success on these claims for breach of contract.

Most of the defendants' actions that are now challenged by Maximus—such as the defendants' discussing the prospects of competing, their gathering and estimating of expenses, their submission of a bank plan and securing a promise of financing from a bank, and the compilation of the information necessary to make a bid—appear to fall under the rubric of preparing to compete against Maximus as opposed to actually competing. *See id.* ("[I]t is normally permissible for employees of a firm, or for some of its partners, to agree among themselves, while still employed, that they will engage in competition with the firm at the end of the period specified in their employment contracts."). At the same time, if "a situation arises in which the principal's affairs conflict with those of the agent, the agent has a duty to deal fairly in the protection of the principal's interests." *Id.*, comment d. Under the circumstances, the court cannot say that Maximus has presented such clear evidence of a violation of fiduciary duty or duty of loyalty that the public interest in vindicating these interests warrants preliminary injunctive relief.

4. *Likelihood of Success on the Merits.* Because the court has concluded that the first three prerequisites for a preliminary injunction have not been shown, it need not address any further the "likelihood of success" requirement.

IV. *Conclusion.*

For the reasons set forth above, plaintiff Maximus's Motion for Preliminary Injunction (Doc. 3) is hereby DENIED. IT IS SO ORDERED this 19th day of November, 1999, at Wichita, Ks.