591 S.E.2d 254

**Forrest A. YOUNKER, Plaintiff
Below, Appellee,**

v.

**EASTERN ASSOCIATED COAL CORP.,
Defendant Below, Appellant.**

No. 31343.

Supreme Court of Appeals of
West Virginia.

Submitted Nov. 5, 2003.

Decided Dec. 3, 2003.

Concurring Opinion of Justice
Davis Dec. 5, 2003.

Davis, J., concurred with separate opinion
joined by Maynard, J.

C. David Morrison, Rodney L. Bean, Steptoe & Johnson, PLLC, Herbert G. Underwood, Clarksburg, for Appellant.

James M. Cagle, Charleston, for Appellee.

PER CURIAM.

Eastern Associated Coal Corporation, appellant/defendant below (hereinafter "Eastern"), appeals entry of a final order of the Circuit Court of Boone County, West Virginia, awarding Forrest A. Younker, appellee/plaintiff below (hereinafter "Mr. Younker") $378,549.00 in a breach of contract claim, after having granted Mr. Younker's partial summary judgment on liability, after having tried the damages aspect of the case and after having denied Eastern's motion for summary judgment. Having reviewed the briefs, the pertinent authorities, and hearing oral argument, we reverse the circuit court's award of partial summary judgment to Mr. Younker. We also find that Eastern is entitled to summary judgment on the breach of contract claim and thus reverse the circuit court's failure to award summary judgment to Eastern.

I.

FACTUAL AND PROCEDURAL
HISTORY [1]

Mr. Younker is a mining engineer who began working for Peabody Holding Company (hereinafter "Peabody") in 1971. In 1987, Peabody purchased Eastern, making it a wholly owned subsidiary. In 1988, Mr. Younker transferred from Kentucky to West Virginia as Eastern's Vice–President of Operations.

On November 16, 1992, Mr. Younker was visited at his home by a federal Internal Revenue Service agent and a West Virginia State Police Trooper, working for the federal government. These agents interviewed him concerning any knowledge he had of coalfield corruption, the subject of a federal probe. During this interview, Mr. Younker admitted to having had a sexual encounter with Donna Adkins (hereinafter "Ms. Adkins"). Mr. Younker denied that he knew that Ms. Adkins had been paid to have sex with him by Abbs Valley, a vendor doing business with Eastern.

On the morning of November 19, 1992, Mr. Younker spoke with Eastern's in-house counsel, Thomas Gallagher (hereinafter "Mr. Gallagher"), about the November 16 interview. Mr. Younker told Mr. Gallagher, "You know, Tom, I'm not much of a churchgoer. And we all do things in our lives which sometimes we're ashamed of and regret doing." Mr. Younker then asked if what he told Mr. Gallagher would be confidential. Mr. Gallagher told him no as Mr. Gallagher represented Eastern. Mr. Gallagher then directed Mr. Younker to Eastern President Peter B. Lilly (hereinafter "Mr. Lilly"). During the November 19 morning meeting with Mr. Lilly, Mr. Younker told Mr. Lilly of the November 16 interview. Mr. Younker also said that he had a problem because he liked to " 'chase skirt' " and that he may have had a "small skeleton" in his closet. Mr. Younker then admitted to a sexual encounter with Ms. Adkins [2] as well as admitting he saw her several times thereafter, albeit in a platonic way.[3] Mr. Younker also informed

---

1. Our recitation of the facts are either undisputed or taken in a light most favorable to Mr. Younker. To the extent that Eastern disputes any of the facts in this opinion, we recognize that they are not binding on Eastern beyond the confines of this opinion.

2. This sexual encounter occurred while Mr. Younker was on Eastern business attending a safety awards banquet in Beckley, West Virginia.

3. One of these contacts occurred in the late summer of 1992, before the November 16, 1992 interview. Mr. Younker admitted that in this meeting Ms. Adkins mentioned that she was in

Mr. Lilly that the agents had alleged that Abbs Valley had paid Ms. Adkins to have sex with Mr. Younker. Mr. Younker then returned to his duties.

That afternoon, Mr. Younker was summoned to Mr. Gallagher's office where Mr. Lilly gave Mr. Younker a resignation memorandum and told him that "... I want you to resign." When asked why, Mr. Lilly responded, " 'No comment.' " Mr. Younker then asked, " 'If I don't sign this, then are you going to fire me, discharge me?' " Mr. Lilly replied, " 'No comment,' " which Mr. Younker took to be an affirmative response. Mr. Younker then signed the document.

In 1994, Mr. Younker sued alleging that he was forced to resign either because of his age or because he cooperated with federal authorities on November 16, 1992. In 1996, over three and one half years after being terminated and over two years after filing his original complaint, Mr. Younker requested and received permission from the circuit court to amend his complaint to add a claim that his discharge constituted a breach of contract under Eastern's Code of Business Conduct (hereinafter "the CBC").[4]

On December 6, 1996, Mr. Younker moved for a partial summary judgment on the breach of contract claim which Eastern opposed. On March 7, 1997, Eastern filed its own motion for summary judgment on all of Mr. Younker's claims then before the circuit court.

On March 21, 1997, Mr. Younker filed a motion to hold his age discrimination and retaliatory discharge claims in abeyance pending a trial on the damages relating to his breach of contract claim.[5] In this motion, Mr. Younker agreed to dismiss the remaining two counts of his amended complaint if this Court affirmed any ruling in his favor. Eastern objected.

On July 31, 1997, the circuit court entered partial summary judgment on behalf of Mr. Younker under the breach of contract claim. On that same day, Eastern withdrew its objection to staying the remaining counts pursuant to Mr. Younker's motion.[6] The circuit court then held a bench trial on damages.

After a number of procedural orders, the circuit court entered an order on November 19, 1999. The circuit court awarded Mr. Younker $378,649.00. The order also granted Mr. Younker's motion to conform the pleading to the evidence under W. Va. R. Civ. P. 15(b) by entering judgment against Eastern on the basis that the evidence at the damages trial showed that Mr. Younker's forced resignation violated W. Va.Code § 22A–1–22 (1994) (Repl.Vol.2002) which prohibits discrimination against a miner who, among other things, reveals to enumerated persons any alleged violation or danger.

On August 21, 2002, the circuit court entered a final order resolving the last of the outstanding motions and providing "this matter is concluded" and striking it from the docket. From these rulings, Eastern filed this current appeal.

## II.

### STANDARD OF REVIEW

 As is customary, we begin by examining the standard of review applicable to the issue before the Court. "Pursuant to Rule 56 of the West Virginia Rules of Civil Procedure, summary judgment is required when the record shows that there is 'no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Consolidation Coal Co. v. Boston Old Colony Ins. Co.*, 203 W.Va. 385, 390, 508 S.E.2d 102, 107 (1998). Here,

---

trouble, that she had done something in the past she should not have done and that she had a diary with his name in it.

4. The CBC was actually one prepared by Peabody, but which was applicable to all of Peabody's subsidiaries. For ease of reference, we refer to the CBC here as Eastern's CBC.

5. This motion was apparently premised upon the assumption that the circuit court would rule in

Mr. Younker's favor on his partial summary judgment motion.

6. Eastern explained that it dropped its opposition to Mr. Younker's motion as it desired to have some resolution to some aspect of the case and because it believed that its motion for summary judgment was erroneously denied.

the instant appeal is before this Court as a result of the circuit court's grant of [partial] summary judgment to [Mr. Younker as well as its award of damages] and its denial of summary relief to [Eastern Associated]. Typically, we apply a plenary review to a circuit court's entry of summary judgment. "A circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Similarly, when review of a circuit court's denial of summary judgment is properly before this Court, we examine anew the circuit court's ruling. "This Court reviews *de novo* the denial of a motion for summary judgment, where such a ruling is properly reviewable by this Court." Syl. pt. 1, *Findley v. State Farm Mut. Auto. Ins. Co.,* 213 W.Va. 80, 576 S.E.2d 807 (2002).

*Tackett v. American Motorists Ins. Co.,* 213 W.Va. 524, 527, 584 S.E.2d 158, 161 (2003) (footnote omitted). In other words, "[i]n considering the propriety of summary judgment in this case, we apply the same standard that is applied at the circuit court level[.]" *Watson v. Inco Alloys Intern., Inc.,* 209 W.Va. 234, 238, 545 S.E.2d 294, 298 (2001). "[I]n making a ruling, 'the judge must view the evidence presented through the prism of the substantive evidentiary burden.'" *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 62, 459 S.E.2d 329, 339 (1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202, 215 (1986)). "In cases of substantial doubt, the safer course of action is to deny the motion and to proceed to trial." *Id.* at 59, 459 S.E.2d at 336.

### III.

### DISCUSSION

■ The core issue in this appeal is whether Eastern's CBC constituted a contract between Eastern and Mr. Younker.[7] Mr. Younker relies on article XII, entitled "Reporting of Violations," which provides:

[Eastern's] business and reputation depends, in large measure, on strict adherence to the provisions of this Code. All employees are encouraged and obligated to report any known or suspected Code violations to the employee's supervisor and the appropriate Counsel. No disciplinary or other retaliatory action will be taken against an employee making such a report and all information provided will be maintained in the strictest confidence.

Based on this provision, Mr. Younker argues that he reported wrongdoing on November 19, 2002. As a consequence of his reporting he was fired. He thus contends that his termination violated the contract the CBC created. Eastern counters, *inter alia,* that the CBC is not a contract as it lacks sufficiently definite terms to be read as a contract pointing out that article XIV is entitled "Nonexclusivity" and provides:

This Code does not constitute a comprehensive, full or complete explanation of the laws which are applicable to the Company and its employees nor does it contain all applicable policies and basis for discipline or discharge. Each employee has a continuing obligation to be familiar with applicable law and all [Eastern] policies and procedures.

Eastern also points out that other courts have found that language similar to article XII does not constitute a contract. We agree with Eastern.

■ "This Court has traditionally recognized that an employment which is of an indefinite duration is rebuttably presumed to be a hiring at will, which is terminable at any time at the pleasure of either the employer or the employee." *Williamson v. Sharvest Mgt. Co.,* 187 W.Va. 30, 32–33, 415 S.E.2d

---

7. We note that Eastern asks us to address all of Mr. Younker's claims, as its motion for summary judgement addressed every claim. However, Eastern agreed to allow Mr. Younker to hold his age discrimination and public policy claims in abeyance pending outcome of this appeal so we have no rulings on these claims from the circuit court. "This Court will usually decline to address a legal position when it was not addressed below ...." *Self v. Queen,* 199 W.Va. 637, 641, 487 S.E.2d 295, 299 (1997) (per curiam) (Starcher, J., concurring). We can, therefore, only address the breach of contract and Rule 15(b) issues. *See infra* note 10. We remand Mr. Younker's age discrimination and public policy claims for further proceedings in the circuit court.

271, 273–74 (1992). Notwithstanding the at-will presumption, "we have also recognized that contractual provisions relating to discharge or job security may alter the at will status of a particular employee." *Bailey v. Sewell Coal Company*, 190 W.Va. 138, 141, 437 S.E.2d 448, 451 (1993). "Thus, representations contained in an employee handbook or policy manual and intended to be used by employers can meet the normal requirements for formation of an implied contract." *Id.*, at 141, 437 S.E.2d at 451.

■■■ However, because of the at-will presumption, "any promises alleged to alter the presumptive relationship must be *very definite* to be enforceable." *Id.*, at 141, 437 S.E.2d at 451 (citing *Suter v. Harsco Corp.*, 184 W.Va. 734, 737, 403 S.E.2d 751, 754 (1991)). The party asserting that an employment was other than at-will bears the burden of rebutting the at-will presumption. *Id.*, at 141, 437 S.E.2d at 451 (citing *Suter*, 184 W.Va. at 737, 403 S.E.2d at 754). The burden a plaintiff undertakes in this regard is heavy, as:

> "[w]here an employee seeks to establish a permanent employment contract or other substantial employment right, either through an express promise by the employer or by implication from the employer's personnel manual, policies, or custom and practice, such claim must be established by clear and convincing evidence." Syllabus point 3, *Adkins v. Inco Alloys International, Inc.*, 187 W.Va. 219, 417 S.E.2d 910 (1992).

Syl. pt. 3, *Wilson v. Long John Silver's, Inc.*, 188 W.Va. 254, 423 S.E.2d 863 (1992).

We have recognized that "[a]n employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons." Syl. pt. 6, *Cook v. Heck's, Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986). In *Cook* the handbook specifically provided a "complete list of rules and disciplinary procedures[.]" *Id.* at 370, 342 S.E.2d at 455. In finding that the handbook constituted a contract, we reasoned, "[t]he inclusion in the handbook of specified discipline for violations of particular rules accompanied by a statement that the disciplinary rules constitute a complete list is *prima facie* evidence of an offer for a unilateral contract of employment modifying the right of the employer to discharge without cause." *Id.* at 374, 342 S.E.2d at 459. We then specifically noted that " '[n]o unilateral contract arises merely by the fact that [the employer] has alerted its employees that certain conduct may form the basis of a discharge.' " *Id.*, at 374, 342 S.E.2d at 459 (citation omitted). We elaborated on this last point in *Wilson v. Long John Silver's, Inc.*, 188 W.Va. 254, 423 S.E.2d 863 (1992).

In *Wilson*, a discharged employee claimed that the company's policies and procedures manual constituted a unilateral contract entitling him to progressive discipline rather than immediate termination. *Id.* at 255, 423 S.E.2d at 864. The employer appealed the denial of its motions for summary judgment, directed verdict and judgment notwithstanding the verdict. *Id.*, at 255, 423 S.E.2d at 864. In finding *Cook* was not satisfied we said:

> Our review of the manual reveals that it did not include any statement proclaiming that the manual was not a contract of employment. However, as Long John Silver's points out, the statements of "Circumstances Warranting Discharge" and "Progressive Discipline" situations did not constitute complete lists since the sections stated "[s]uch infractions include, but are not limited to: … " and "[s]uch circumstances include, but are not limited to: …," respectively. We cannot find any clear and convincing evidence that the manual contained a promise, let alone a definite promise, sufficient to modify the employment at will relationship.

*Wilson*, 188 W.Va. at 257, 423 S.E.2d at 866. We believe that *Wilson* disposes of Mr. Younker's claims.

Like the policy manual in *Wilson*, Eastern's CBC does not contain a statement proclaiming that it was not an employment contract. However, also like the manual in *Wilson*, the CBC disciplinary provisions are not exclusive. Indeed, article XIV is specifically entitled "Nonexclusivity" and provides:

This Code does not constitute a comprehensive, full or complete explanation of the laws which are applicable to the Company and its employees nor does it contain all applicable policies and basis for discipline or discharge. Each employee has a continuing obligation to be familiar with applicable law and all Peabody policies and procedures.

Thus, we find that the CBC does not reach that *"very definite"* level of specificity required to create a contract. In so finding, we join a number of other courts that have reviewed CBCs similar to Eastern's and found that they embodied only aspirational goals rather than contractual terms. *See, e.g., Hinchey v. NYNEX Corp.,* 144 F.3d 134, 141–42 (1st Cir.1998); *Marsh v. Delta Air Lines, Inc.,* 952 F.Supp. 1458, 1466 (D.Colo. 1997); *Allen v. Ethicon, Inc.,* 919 F.Supp. 1093, 1100 (S.D.Ohio.1996); *Tripodi v. Johnson & Johnson,* 877 F.Supp. 233, 237 (D.N.J. 1995). *Cf. Maximus, Inc. v. Thompson,* 78 F.Supp.2d 1182, 1190 n. 4 (D.Kan.1999) (employees could not be held liable for breach of contract for not disclosing potential conflicts as required by company's standards of business conduct and ethics).[8] Consequently, we find that the circuit court erred in failing to grant Eastern summary judgment on the breach of contract claim and therefore reverse the circuit court.[9]

## IV.

### CONCLUSION

■ The judgment of the Circuit Court of Boone County is reversed and this case is remanded for further proceedings not inconsistent with this opinion.[10]

Reversed and remanded.

Justices DAVIS and MAYNARD concur and reserve the right to file concurring opinions.

DAVIS, J., concurring.
(Filed Dec. 5, 2003)

I fully join in the majority opinion. I believe the Court has struck the appropriate balance between the interest of business in adopting and enforcing Eastern's Code of Business Conduct (hereinafter referred to as "the CBC") and the reasonable expectations of the employees subject to it. I also observe that while CBCs are not new, this Court has not, until now, had the opportunity to explore them. Thus, I write to generally review the nature of CBCs and their potential value in advancing desirable goals for society at large, the businesses themselves and their employees.

### A. What is a Code of Business Conduct?

As early as the 1970s, commentators recognized that "the demand for [code of business conduct] adoption by all public companies is likely to increase." Charles E. Harris, *Structuring a Workable Business Code of Ethics,* 30 U. Fla. L.Rev. 310, 312 (1978). Since then, "corporate codes have become a common corporate document." Harvey L. Pitt & Karl A. Groskaufmanis, *Minimizing Corporate Civil and Criminal Liability: A Second Look at Corporate Codes of Conduct,* 78 Geo. L.J. 1559, 1602 (1990). Because many businesses have such codes, it would be useful to identify

---

**8.** We also find that Mr. Younker could not have prevailed under promissory estoppel. *See Vasey v. Martin Marietta Corp.,* 29 F.3d 1460, 1466 (10th Cir.1994) ("In the instant case, Plaintiff's promissory estoppel claim fails because he has not shown that he acted or forbore from acting as a result of Defendant's employment policies.")

**9.** We also find that Mr. Younker was not fired for *reporting,* but was fired for *what he reported*—his relationship with a prostitute involved in coalfield corruption. We do not think it a reasonable interpretation of article XII to say that it immunizes an employee's illegal, unethical or immoral conduct as long as the employee reports such misconduct before being caught.

**10.** We also agree with Eastern that the circuit court erred in allowing Mr. Younker to amend his pleadings under W. Va. R. Civ. P. 15(b) to assert that his termination violated W. Va.Code § 22A–1–22(a). Our review of the record shows that Eastern did not impliedly agree to the amendment, nor do we think that a safety statute protecting miners and authorized representatives of miners reaches a corporate vice-president; thus, we reverse the circuit court on this issue as well. Finally, in light of our decision today, we find that Mr. Younker's cross-assignments of error are moot.

and discuss the definition of a CBC. The definition of a CBC can be found in recent Congressional legislation requiring public corporations to either adopt a CBC for corporate financial officers or explain why such a code has not been adopted. Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204 § 406(a), 116 Stat. 745, 789 (codified at 15 U.S.C.A § 7264(a) (West.2002 & Supp. 2003)).[1] The federal regulations implementing the Sarbanes–Oxley Act expand the statutory definition of code of conduct[2] to generally mean written standards reasonably designed to deter wrongdoing; to promote honest and ethical conduct and compliance with applicable governmental laws, rules and regulations; to govern prompt internal reporting to an appropriate person or persons, identified in the code, of code violations; and to ensure accountability of those subject to the code for adherence to it. *Disclosure Required by Sections 406 and 407 of the Sarbanes–Oxley Act of 2002*, 68 Fed.Reg. 5110, 5118 (Jan. 31, 2003). Thus, federal law provides us with a benchmark for defining CBCs. I now turn to an examination of the potential utility of such codes.

### B. Why CBCs are Important

The widespread adoption of CBCs reflects "an unstated belief by academics, regulators, and legislators that a written code of conduct is an important vehicle for promoting corporate self-governance and the development of ethical standards." *Id.* at 1600. CBCs have been recognized by commentators and regulators alike as a potentially desirable means to advance social policy. *See, e.g.,* Cristina Baez, et al., *Multinational Enterprises and Human Rights*, 8 U. Miami In't & Comp. L.Rev. 183, 324 (1999–2000) ("[T]hese codes seem to provide an ideal mechanism for creating awareness and respect for human rights within the structure of a corporation."); Pitt & Groskaufmanis, *Corporate Codes of Conduct*, 78 Geo. L.Rev. at 1635–36 n. 449 (noting that Johnson & Johnson's corporate credo was " '*the* contributing factor in the company's exemplary behavior' " when the company's Tylenol drug was poisoned in the early 1980s (citation omitted)); U.S. Dep't of Labor, *The Apparel Industry and Codes of Conduct: A Solution to the Int'l Child Labor Problem?* (1996) (noting that CBCs can be an effective tool for fighting child labor exploitation). Moreover, the potential benefits of a CBC also extend to a business's bottom line. Research from the Institute for Business Ethics "suggests that companies with a published code of ethics are consistently more admired, have a better rating in terms of managing non-financial risks and show better financial performance than companies without ethical codes." *Ethics Pays*, Ethical Corp. Magazine at 6 (May 2003). Given the important role that CBCs can play in advancing important social goals, I applaud the majority for striking an appropriate balance between the impact of CBCs and the expectations of those subject to them.

For the foregoing reasons, I concur. I am authorized to state that Justice MAYNARD joins in this concurring opinion.

---

1. Moreover, both the New York Stock Exchange and the National Association of Securities Dealers require that listed companies have codes applicable to directors, officers and employees. Securities and Exchange Commission Approval Order, Release No. 34–48745, 68 Fed.Reg. 64154, 64178 (Nov. 12, 2003).

2. The Sarbanes–Oxley Act calls such codes "code[s] of business ethics." The regulation implementing Sarbanes–Oxley also requires a code of business ethics to cover the chief executive officer.